HENRY GAMBLE v. WILLIAM ROSS ET AL., AND HIRAM
W. SIBLEY AND ISAAC BEARINGER v.
WILLIAM ROSS ET AL.

[Two cases.]

*Land contract—Right of possession—Mortgage—Removal of timber
—Waiver of security.*

1. An executory land contract has no tendency to show any legal
   title in the vendee, or in any person claiming under him; and,
   if it conveys no legal possessory interest in or upon the land,
   it does not give the vendee a legal right to its possession;
   citing *Buell v. Irwin*, 24 Mich. 145.

2. Where the vendee in a land contract assigned it to third parties
   as collateral security for the performance of a contract with
   them, and to secure them for money advanced to pay the
   balance of the purchase price of the land, and in the assign-
   ment authorized the vendor to convey the land to the assignees,
   the papers will be construed together, and the deed treated as
   a mortgage; citing *Enos v. Sutherland*, 11 Mich. 538; *Ferris v.
   Wilcox*, 51 Id. 105; *Jeffery v. Hursh*, 58 Id. 246.

3. The mere fact that, prior to the performance of said conditions,
   the assignees allowed the vendee to lumber the land so con-
   veyed to them with other lands owned by them will not be a
   waiver of their rights under the deed, contract, and assignment.

4. Where in replevin by the vendee from the assignees, of lumber
   manufactured from logs taken from their lands and from the
   lands conveyed to them, the assignees claim to have made
   advances upon the logs cut from the latter lands, and to have
   received an order from the vendee turning over to them the
   lumber manufactured from said logs, which claims are denied
   by the vendee, who claims to have acted in his own right, it
   is for the jury to pass upon such disputed questions of fact.

5. In case such issue is found in favor of the vendee, and it is further
   found that he lumbered the latter lands on his own account,
   being in possession of the same, all with the knowledge and
   consent of the assignees, the jury might be justified in finding
   that their lien under their mortgage was waived, and that they
   looked personally to the vendee, and not to such security.

Error to Wayne. (Hosmer, J.) Argued October 16, 1891. Decided November 13, 1891.

Replevin. Plaintiffs bring error. Reversed. The facts are stated in the opinion.

*George W. Weadock* (*T. E. Tarsney*, of counsel), for appellants, contended:

1. Permitting Gamble to cut the lumber from the Webber land was a waiver of defendants' right upon it as security, and constituted a license to cut, which, by reason of its exercise, vested the title and ownership of the lumber in question in Gamble; citing *Greeley v. Stilson*, 27 Mich. 157; *Haskell v. Ayres*, 35 Id. 89; *Wetmore v. Neuberger*, 44 Id. 362; *Spalding v. Archibald*, 52 Id. 365; *Wilson v. Maltby*, 59 N. Y. 129.

2. How. Stat. § 6190, applies to this case.

3. No construction that can be put upon Gamble's telegram will give Osgood authority to give the receipt to defendants; citing *Thomas v. Greenwood*, 69 Mich. 215; and the receipt recited that the logs were to be sawed into lumber according to the contract with Gamble, which provided for its removal by Gamble from Osgood's dock.

4. If there was any question as to possession, it should have been submitted to the jury. Even though these advances for lumbering were claimed to be or were made in good faith, this would not affect the bill of sale of plaintiffs, properly recorded; citing *Talcott v. Crippen*, 52 Mich. 634; *Bank v. Summers*, 75 Id. 111; and see *Sheldon v. Warner*, 26 Id. 403, 407.

5. The lumber from the Webber land being owned by Gamble, the burden of proof was on the defendants to show a change of possession under the statute cited, which they failed to do, and the circuit judge should have so instructed the jury.

*McKnight, Humphrey & Grant*, for defendants, contended:

1. The least that could be claimed for defendants' title to the land would be that they held as trustees, and this put the legal title in them, and neither Gamble nor his grantees could get any title to the lands or timber except through the holders of the legal title; citing *Beardslee v. Horton*, 3 Mich. 562; *Forrest v. O'Donnell*, 42 Id. 558; *Henderson v. Sherman*, 47 Id. 267; *Atwood v. Frost*, 57 Id. 234.

2. Under the statute of frauds, conveyances of land or interests

therein must be by deed; and that which is evidenced by deeds of conveyance cannot be changed by parol testimony of promises, agreements, or understanding; citing *Hayes v. Livingston,* 34 Mich. 384.

3. It is true that a parol license to cut standing timber is good until revoked; citing *Morrill v. Mackman,* 24 Mich. 279; but in this case the plaintiffs' evidence shows that they had no license or authority to cut timber into logs from the Webber lands, and they seek to establish a title to them by showing a title by parol to the lands from which they were taken; and the only license Gamble had from the defendants to cut was under the terms of the contract, by which the rights of the parties would be measured, so far as any license was concerned; citing *Sovereign v. Ortmann,* 47 Mich. 183; *Rust v. Bennett,* 39 Id. 521.

4. The defendant in replevin may controvert the plaintiff's title, and he may show title in a stranger; citing *Busch v. Nester,* 70 Mich. 530, citing with approval *Halleck v. Mixer,* 16 Cal. 579.

5. Charging Gamble on defendants' books with the purchase price of the lands and the amount of supplies advanced to him by them was not an admission that the property was his, nor could it affect the title to the property; citing *Hood v. Olin,* 68 Mich. 171.

LONG, J. These are actions of replevin, brought in the Wayne circuit court to recover possession of 2,100,-000 feet, board measure, of pine lumber manufactured at Sailors' encampment, Chippewa county, this State, from logs marked "H. G." and circle "G.," and brought from Sailors' encampment to Detroit on the steam-barges Negaunee and King, and tow-barge Teutonia. In the Gamble case the lumber taken under the writ was from the barge Negaunee, and comprised about 600,000 feet. In the Sibley case the lumber taken under the writ was from the barge King and its tow, Teutonia.

The causes were tried before a jury, who returned verdicts in each case by direction of the court in favor of the defendants. The defendants waived return of the property, and took judgments for its full value. In the

Gamble case the judgment was for $6,070.55, and in the
Sibley case for $10,382.91.

The plaintiffs bring error.

Both cases grow out of the same transaction, and
involve the title to certain lands and timber from which
the lumber was manufactured.    Whatever rights the
plaintiffs have in the Sibley case they acquired through
Henry Gamble under a certain chattel mortgage upon
the lumber taken from the barges King and Teutonia.
Henry Gamble resides at Saginaw, this State.    Isaac
Bearinger also resides in Saginaw, and Hiram W. Sibley
resides in Rochester, N. Y.    These last-named gentle-
men are doing a lumbering business at Saginaw under
the firm name of Sibley & Bearinger.

The facts as they appeared upon the trial of the
causes are, substantially, that on November 24, 1886,
Henry Gamble, plaintiff in the first suit, entered into a
land contract with James G. Ross, of Quebec, Can.,
doing business under the firm name of Ross & Co., by
which he agreed to purchase a large quantity of pine
timber on lands situate in the Upper Peninsula of this
State for the sum of $30,000, to be paid $5,000 on deliv-
ery of contract, and the balance in two payments of
$12,500 each, payable in one and two years from the
date of the contract, with interest at 7 per cent.    This
contract contained the usual conditions specified in con-
tracts for the purchase of pine timber, and included an
agreement by which the ownership and possession of the
timber was retained in the first party until the purchase
price was fully paid.    The timber was to be removed
within five years from the date of the contract.

On August 4, 1886, Gamble purchased from William
L. Webber 640 acres of pine land, situate in the same
township wherein a portion of the timber described in
the Ross contract is situate.    The contract with Webber

also provided that Gamble should remove no timber or logs from the land, without the written consent of the first party, until full payment was made.    The purchase price of the W.ebber land was $6,500, payable $500 on delivery of contract, $2,000 on or before January 1, 1887, $1,000 on or before January 1, 1888, $1,500 on or before January 1, 1889, and $1,500 on or before January 1, 1890, with interest on deferred payments at 7 per cent., according to four promissory notes bearing even date.

On December 30, 1889, Gamble entered into a contract with William, Frank, John Theodore, Frances Ella, and Annie Ross, heirs and successors of said James G. Ross, deceased, which contract recites the execution of the contract for the purchase of pine timber of date November 24, 1886, from James G. Ross, and recites that Gamble desired to manufacture the pine timber growing upon the land described in that contract into wany board pine timber for the Quebec market, and also into saw-logs. It also recites that there is a balance due upon the James Ross contract of $21,394.78. The contract further provides for the manufacture of the wany board pine on the Ross land prior to May 1, 1890, by Gamble, and it also provides for the making of certain advances by the Rosses to Gamble from time to time, as the manufacture of the timber progressed, and for the payment of freight to Quebec. The contract also provides that for all saw-logs manufactured from said timber the second party should receive certain advances. By this contract the Rosses were to sell the wany board pine timber in the Quebec market, and retain the money advanced upon it, with interest at 7 per cent., and 5 per cent. commission to be held for services in conducting said business, which amount was to be deducted from the proceeds of this timber, as well as the expense of James Connolly, the agent of the Rosses, in looking

after the timber; and, in addition to these deductions, first parties were to deduct the balance due on the contract of November 24, 1886, together with the interest. The contract further provides for the manner of manufacturing the wany board pine timber; further, that all the timber and logs so manufactured should remain the property of the first parties until all the said advances, interest, and commission, and the amount due for stumpage on the contract of November 24, 1886, should have been paid; specifies the method of marking the timber with the Rosses' mark, and for an accounting. The contract also contains the following provision:

. "It is further understood and agreed that the said second party shall give to the said first parties an assignment of his contract which he holds from William L. Webber, of East Saginaw, Michigan, for the purchase of lands or interest in lands described as follows."

Here follows a specific description of the lands, and then the contract further provides:

"As collateral security to the said first parties that he will execute and carry out the contract herein contained, and pay the balance due the said parties of the first part under the said contract of November 24, 1886, above referred to, made and executed with Ross & Co., as aforesaid."

It also provides that the parties of the first part, the Rosses, should dispose of the saw-logs so manufactured, and out of the proceeds deduct the money advanced and the interest at 7 per cent., 5 per cent. commission, and the expense of Connolly, their agent; the balance to be applied to the payment of the contract of November 24, 1886, until the same should be fully paid. This contract also refers to a contract made by Gamble with J. Burstall & Co., of Quebec, dated December 2, 1889, for the sale of the wany board timber. On December 2, 1889, Gamble entered into a contract with J. Burstall & Co.,

of Quebec, by which he agreed to sell to them 100,000 cubic feet of wany board pine timber, to be delivered at Purchaser's Cove, Quebec, not later than July 15, 1890.

It appears that Mr. Gamble entered upon the performance of the contract of December 30, 1889, in the winter of 1889–90, and got out about 80,000 cubic feet of wany board timber from the Ross lands, described in the contract of November 24, 1886. It appears also that Gamble was unable to obtain from the Ross lands the full quantity of wany board pine timber to fulfill his contract with J. Burstall & Co., and he called upon Mr. Connolly, who represented the Rosses, and explained to him the difficulty, and that he might be held for damages under the Burstall contract; but that, if he could cut from the Webber lands the balance that he needed, he could fulfill his contract with Burstall. He also wrote Mr. Connolly on March 25, 1890, that there was $3,600 due on the Webber lands, and before he could cut any timber it would be necessary to pay that amount; that he had explained this matter to Mr. Frank Ross when he was in Quebec. He then says:

"I wish you would see about this matter, as we will have to commence and cut the latter part of next week, and it will be necessary to see that this is paid before I cut any. Then I can get a deed of the property, and your security will be good."

Mr. Connolly answered this letter on the 27th, and stated to Mr. Gamble that he noted what he said about the Webber lands; that he would write Ross about it, and get his instructions to draw for the amount, and would then instruct him when to get the deed. On April 8 Mr. Connolly again wrote Mr. Gamble upon this subject as follows:

"*Dear Sir:* I find from a letter received here yesterday

88 Mich.—21.

that your men have left camp No. 2 on the south side of the road, and have gone to Wellsburg, to commence making, I presume, on the Webber lot. There is also one gang, as far as I can learn, gone to Louk's camp, to make what is there. I had a letter from Quebec with reference to making advances to pay balance due on the Webber lot, in which they say they will make advances if you can lumber and put in the river the whole of this lot on or before the first of June next. Now, the question is, can you do it? If you think you can, you had better make arrangements with Webber for the deed; but I do not think you can do so, unless you go there and attend to the matter yourself. I would not feel justified in making the advances unless you go and remain there, and put some capable man there to make the timber and cut the logs at once. So please let me know at once what you intend doing."

It appears that Mr. Gamble, after the receipt of this letter, proceeded to cut the square timber on the Webber lands to fulfill his contract with Burstall & Co. At the time he commenced cutting he had not yet arranged the payments with Mr. Webber, but on June 6, 1890, he wrote Mr. Connolly as follows:

"*Dear Sir:*  *  *  *  I arranged with Webber. I gave him a draft on you for $3,600; that is, to close up the land deal. He does not know that we were cutting, and I would like to have the matter closed up as soon as the papers are ready. I made out an assignment. He is to make out a warranty deed for Ross & Co. on the estate. Mr. Weadock is looking after the matter, so you can feel assured that the papers will be right. Now, Mr. Connolly, you be sure and have this Webber business fixed up."

On the date of this letter Mr. Gamble assigned his contract with Webber of date of August 4, 1886, to the defendants Ross. This assignment contains the following clause:

"*Whereas,* there yet remains unpaid upon the purchase price of said land the sum of $3,600; and *whereas,* said

first parties to said contract last above named have agreed to advance the said sum of $3,600 to pay said Webber said balance:

"Now, therefore, the said Henry Gamble, for a valuable consideration to him paid, and for the purposes stated in said contract of December 30, 1889, and to secure said Rosses for the amount advanced to pay the purchase price of said land, does hereby sell, assign, transfer, and set over said contract to the Rosses above named, and hereby authorizes said Webber to make, execute, and deliver to them the warranty deed of said land specified in said contract to said first parties in said contract of December 30, 1889, for the purposes aforesaid."

On the date of the execution of this assignment, William L. Webber and wife executed and delivered to the Rosses a warranty deed of the land described in the land contract between himself and Gamble and assigned to the Rosses by Gamble. This deed was recorded June 21, 1890, in the proper office. Mr. Connolly, the agent of the Rosses, paid to Mr. Webber, on the delivery of this deed, the balance—$3,600—due him. It is conceded that the title to the lands and timber described in the Webber contract was in Webber in fee-simple at the date of the contract. It is also conceded that the Webber land was valuable only for the pine timber upon it.

It appears that on May 1, 1890, Henry Gamble, the plaintiff, entered into a contract with C. Weller & Son, of Sault Ste. Marie, Mich., by which they were to cut and bank all the white and Norway pine suitable for timber upon certain descriptions of land. These lands were in part the Webber lands, and in part what was known as the "Ross Lands." In pursuance of this contract, Weller & Son lumbered the pine timber, or most of it, from the land described, and Gamble, entered into a contract on June 2 with Moiles' Tug Line to tow the logs from where they were banked to the John Spry Lumber Company mill at Sailors' encampment, on Nee-

bish island, in the river St. Mary. Gamble also on the
same date entered into a contract with S. W. Osgood,
of Sault Ste. Marie, who operated the John Spry mill,
to manufacture these logs into lumber. By the terms of
this agreement Gamble agreed to furnish ·Osgood at his
mill on Neebish island 3,000,000 feet or upwards of pine
logs, to be delivered in the boom at the mill during the
sawing season of 1890, and to pay Osgood the sum of
$2.50 per M. feet, board measure, for all the lumber
sawed, and the number of feet so sawed to be deter-
mined by the return made by the tallyman, who was to·
be agreeable to both parties.

At the time Gamble entered into the contract with
the Ross heirs—December 30, 1889—he had defaulted on
the Ross contract, as well as the Webber contract. On
the Webber contract a decree had been entered against
him forfeiting his rights under that contract.

The plaintiff's testimony tended to show that he took
enough square timber off the Webber land to fill the
balance of the Burstall & Co. contract, which was about
11,700 feet. This timber from the Ross lands as well as
the Webber lands was delivered to Burstall & Co., and
the Rosses had the proceeds—about $35,000. They had
in the meantime advanced to the plaintiff some $17,000
to get out the timber, so that the account between Gam--
ble and the Rosses, at the close of the Burstall contract,.
stood about as follows :

Due to the Rosses under the first contract, as
　acknowledged by the contract of December 30,
　1889 _____ $21,394 78
Advances made by the Rosses_____ 17,000 00
Paid Mr. Webber for deed_____ 3,600 00
　　　　　　　　　　　　　　　　　　　　　　　　　　$41,994 78
Cr.　By moneys from Burstall contract _____ 35,000 00·
　　　Balance due Rosses_____ $6,994 78

Mr. Gamble testifies that the indebtedness at this time must have amounted to about $5,000.

On May 1, 1890, Gamble entered into the contract with Weller & Son to lumber the Webber lands, and the Ross lands which adjoined them. These lands were lumbered by Weller & Son, the logs taken to the Osgood mill, and cut into lumber. Mr. Gamble testifies that it was understood by Mr. Connolly and himself at the time this contract was let that the Ross lands adjoining the Webber lands contained something over 2,000,000 feet. The lands were lumbered under the direction of the plaintiff, and under his direction the logs were taken to Osgood's mill, and there manufactured into lumber. Mr. Gamble says that at the time the Weller & Son contract was entered into it was intended that the logs from the Webber and the Ross lands should be separately marked, so that they could be distinguished, but that the cutting was commenced in his absence, and they were intermingled; but he gives an estimate of the amount coming from each tract. He claims that the timber coming from the Webber lands was superior in quality to that from the Ross lands, as the logs from the Webber lands were from green timber, while the Ross lands were burned over and the timber worm-eaten. Aside from the Ross lands lumbered were other lands specified in the contract of December 30, 1889, which were not lumbered, and upon which there is estimated by Mr. Gamble to be about 6,000,000 feet. All the logs cut under the Weller & Son contract from both tracts amounted to 2,552,779 feet, of which only 433,727 feet came from the Ross lands, the balance being taken from the Webber tract.

From the time the lumbering commenced the defendants made advances to Mr. Gamble. They advanced on the Weller & Son contract, $8,586.48; they paid for transportation to Waiska bay by rail, $4,049.90; they paid for

the towing to the mill, $1,250.60; and they also paid the saw-bill to Osgood, $5,728.91. Mr. Gamble claimed at first to have paid on the lumbering about $500 in supplies; but admitted that this was settled for under the Burstall contract. The total amount paid by defendants on this lumber amounted to $19,615.89.

It is claimed, however, by Mr. Gamble, that there was no arrangement with the defendants by which they were to advance anything for lumbering the Webber lands; that those advances were for cutting and manufacturing into lumber the logs from the Ross lands adjacent to the Webber lands; and that the defendants never claimed that these advances, or any part of them, were on the Webber logs and timber until it was found that the logs from the Ross lands fell short of the 2,000,000 feet, and that then for the first time the defendants claimed the advances were made upon the lumbering on the Webber lands as well as upon the Ross lands. While this is in dispute, the court having directed the verdict in favor of the defendants, we must take the testimony of the plaintiff as true in determining the questions raised.

The logs were thus intermingled and sawed at the Osgood mill. After the lumber was sawed,—or a portion of it,—and piled upon the Osgood dock, Mr. Gamble sold and shipped some 480,000 feet to Chicago parties. In November he procured the three barges, and commenced loading them from the dock, when the defendants brought suit there in replevin, and took charge of the lumber, claiming to be the rightful owners. What the *status* is of this replevin suit is not shown; but after this replevin suit the defendants proceeded to load the lumber on the three barges, and conveyed it to Detroit, where these suits were commenced. This left only about 180,000 feet of lumber at Osgood's mill, cut from all the lands, and that part of it so left was of an inferior quality.

It is claimed by the defendants that the advances so made by them were upon the Webber logs as well as those cut from the Ross lands, and that they are the legal and equitable owners of the whole timber. It appears further in the case that on June 23, 1890, Mr. Connolly, acting for the defendants, made a demand upon Osgood that he receipt for the logs as fast as they came into the mill-boom, in the name of the defendants. This applied to all of the logs taken from the Ross lands as well as those taken from the Webber lands. Upon receipt of this demand, Mr. Osgood telegraphed Gamble at East Saginaw as follows:

"Connolly demands that I give Ross & Co. receipts for your rafts, and hold lumber subject to their order. Wire me instructions.

"S. W. OSGOOD."

Mr. Gamble wired back, saying:

"Yes, you can give Connolly receipt for my raft."

On the 24th day of June Mr. Gamble also gave to Connolly, for Ross & Co., the following order:

"BAY CITY, MICH., June 24, 1890.
"S. W. OSGOOD, ESQ.,
         "Sailors' Landing.
"*Dear Sir:* You will please hold, subject to the order of John Ross & Co., all the logs I have delivered and will deliver from Waiska bay, about (3,500,000) three million five hundred thousand feet. I am going up to-morrow or next day, and will give you instructions how to cut them into lumber, which lumber you will hold subject to their order.
                "Yours truly,
                    "HENRY GAMBLE."

A copy of this order was served by Ross & Co. on Osgood immediately after it was given, and Osgood gave to Connolly, for Ross & Co., the following receipt:

"Received of John Ross & Co. raft of pine logs marked 'G. and H.,' which are to be manufactured into lumber

as per contract with Henry Gamble, and will hold the lumber produced by said logs subject to the order of John Ross & Co., they guaranteeing payment of saw-bill on same according to terms of contract.

"S. W. Osgood."

Mr. Gamble claims that this order was presented to him, and he signed it without knowing its contents.

The claim of the plaintiff in the Gamble case is that in the lumbering of the Webber lands the Rosses had nothing to do; that Mr. Gamble was in possession of the lands all the time, and continued to be in possession of the land and saw-logs cut from it, and the lumber manufactured from them, up to the latter part of November, 1890, when Connolly shipped the lumber to Detroit; that the lumbering of those lands was completed some time in September, or the latter part of August, 1890; that the Rosses had no part in lumbering or the delivery of the logs or the manufacturing of the logs specified in the Weller & Son contract.

The plaintiff relies upon but two propositions:

1. That, under all the evidence, the court should have directed a verdict in favor of plaintiff.

2. That, if this view cannot be sustained, at least certain questions were raised which should have been submitted to the jury.

He claims that defendants never had any interest in the Webber lands, except as mortgagees, as collateral security, in the contract of December 30, 1889, and for the payment of the $3,600 advanced to Mr. Webber to pay the balance due him on the purchase price of the lands; and that, while the contract of December 30, 1889, referring to the Webber contract, followed by the delivery to the defendants of the warranty deed from Mr. Webber and the payment to Mr. Webber of the balance of the purchase price, placed in defendants the record title to the Webber lands and the

timber thereon, yet that such title was defeated, so far as the passage of the legal title was concerned, by a contemporaneous defeasance thereof; that it was as security only, and Mr. Gamble was the owner of the whole property, subject to defendants' mortgage interest; and that while they (the defendants) might have the right to proceed in a court of equity to restrain Gamble or any one else from cutting timber or in any way depreciating their security, when they did not do so, and permitted him to cut and remove the timber from the land, when it was once severed from the land and removed it became the personal property of Mr. Gamble, free from the mortgage; and that he could, from the time of its being severed from the land, do with it as he saw fit, either sell or mortgage it.

It is further contended that, should it be found that Gamble was not the legal owner of the timber while on the land, he was the equitable owner; and when he was permitted to sever it he became the legal owner of the logs and the lumber into which it was manufactured, and as such owner he had continued possession up to the time of its removal from the docks by the defendants.

It is also contended that when the defendants permitted Gamble to cut the timber from the Webber land it was a waiver of their rights upon it as security, and constituted a license to cut, which, by reason of its exercise, vested the title and ownership of the lumber in question in Gamble.

The contract between Mr. Gamble and Mr. Webber was dated August 4, 1886. This was a contract to purchase the land in controversy. The title was in Mr. Webber, and did not vest in Mr. Gamble under the contract. It was held in *Buell v. Irwin,* 24 Mich. 145, that—

"An executory contract for the sale of land has no

tendency to show any legal title in the vendee, nor in any person claiming under him."

It was further held that, if the contract does not purport to convey any legal possessory interest in or upon the land, it does not give the vendee a legal right to the possession of such land.

Under the Webber contract Mr. Gamble had no rights except to purchase within a given time for a certain given sum. He could remove none of the timber. He had an equitable interest, and was entitled to have the legal title upon the conditions being performed. On December 30, 1889, and after the Webber contract had been declared forfeited, he entered into the Ross contract. By the terms of this contract he was to assign the Webber contract as collateral security that he would perform the contract of December 30, 1889, with the Rosses, and pay the balance due under the original contract of November 24, 1886. On June 6, 1890, Gamble did assign to the Rosses the Webber contract, reciting that the assignment was made for the purposes stated in the contract of December 30, 1889, and to secure the Rosses for the moneys advanced to pay the purchase price of said land. By the terms of this assignment Mr. Webber was authorized to make the deed of the lands to the Rosses. On the same date Mr. Webber made and delivered the deed to the Rosses. These papers must be construed together. While the deed is absolute in form, yet the contracts, with it, clearly evidence the intention of the parties. It was not intended by Mr. Gamble, nor understood by the Rosses, that the Rosses were to have the title absolutely in fee. The deed was intended as a mere security, and the conditions upon which the Rosses took it are clearly indicated in the assignment of the contract executed on the same day,—*i. e.*, a reconveyance of the land upon.

the performance of these conditions. It must therefore
be treated as a security, or, in other words, a mortgage.
It falls within the principles laid down in *Enos v. Suther-
land,* 11 Mich. 538; *Ferris v. Wilcox,* 51 Id. 105; *Jeffery
v. Hursh,* 58 Id. 246. The several contracts and the
deed must therefore be treated as a mortgage, under
which the Rosses were secured for the advances made for
the purchase of the Webber land and the faithful per-
formance of the contract of December 30, 1889.

We have seen from the plaintiff's own showing that
these advances have not been paid, and the contract has
never been fully performed. The legal title was vested
in the Rosses, subject to be defeated and vest in
Gamble on the performance of the conditions. These
conditions not being performed, Gamble was not in a
position to demand his deed. The mere fact that the
Rosses permitted Gamble to lumber the Webber land
with their land would not be a waiver of their rights
under this security, under the circumstances admitted
upon this record by plaintiff Gamble.

Plaintiff insists, however, and so testifies, that the
defendants had nothing whatever to do with the lum-
bering of the Webber lands, made no advances upon
those logs or lumber, and no agreement was ever made
that they should do so. He also insists that he never
knew the contents of the order given by him upon
Osgood to hold the lumber subject to the order of the
Rosses; that he signed the paper without knowing its
contents. Under the plaintiff's claim it was a question
of fact for the jury whether defendants made advances
upon the logs from the Webber lands. It was also a
question of fact whether the plaintiff knowingly signed
the order to turn the lumber over to the Rosses which
was manufactured from the Webber lands. The court
was in error in not submitting these questions' to the

jury. If the defendants did make advances upon the lumbering of the Webber lands, and the plaintiff so understood, and assented to it, and received the advances, it is very strong evidence that the defendants did not intend to release their security upon the Webber lands and the timber thereon, and that the plaintiff did not understand that the defendants intended so to do. These circumstances would show pretty clearly that the parties understood that the Webber lands were still held as security by the defendants. If, on the other hand, the advances were not made on the Webber logs, and not so understood or intended, it would be some evidence that the defendants were permitting the plaintiff to handle the Webber timber as he saw fit, and were taking their chances that he would apply the proceeds to the payment of his indebtedness to them under the contract.

If the plaintiff signed the order on Osgood, set out above, to hold the logs and lumber subject to the order of the defendants, knowing its contents, it would also be strong evidence that the parties understood the advances were made upon the logs from the Webber land as well as from the Ross land, and that they did not intend to release their security thereon. On the other hand, if the advances were not made upon the Webber land, and Gamble did not understandingly sign the order upon Osgood to hold the logs and timber subject to the Rosses' order, but his signature was obtained by misrepresentation or fraud, and he lumbered the Webber lands upon his own account, being in possession of the same all the time, making all the contracts for lumbering, hauling, sawing, etc., with the knowledge and consent of the Rosses or Connolly, the jury might be justified in finding that the lien under their mortgage was waived, and they were looking personally to Gamble to make payments on the contract.

If these facts are established (and they are questions for the jury), and the defendants waived their lien under their mortgage security, or did not intend to insist upon it, but to look to Gamble personally, then the plaintiffs would be entitled to recover in each case, as Sibley & Bearinger would have acquired under their chattel mortgage all the rights which Gamble had. Of course this can apply only to the lumber from logs coming from the Webber lands in either case. If, however, Gamble had no right to recover, it is difficult to see how Sibley &. Bearinger could recover under the circumstances stated. If defendants' contention is right, they had at least a mortgage interest. They made advances to lumber the logs from the land, and before the chattel mortgage was given had obtained from Gamble the order for Osgood to hold the lumber for them, and subject to their order. Osgood agreed so to hold it. This applied to all the lumber. The defendants had taken such possession as it was possible to take under the circumstances. Sibley & Bearinger could have been protected by making the least inquiry of the parties in possession. They do not claim to have done this.

The court properly held that the claim of defendants upon the lumber was not void by reason of not being filed as a chattel mortgage.

For the errors pointed out both cases must be reversed, with costs, and new trials ordered.

CHAMPLIN, C. J., MORSE and McGRATH, JJ., concurred. GRANT, J., did not sit.