————o————

HIRAM W. SIBLEY AND ISAAC BEARINGER v. WILLIAM ROSS ET AL.

[See 88 Mich. 315.]

*Mortgage—Waiver of lien—Removal of timber.*

The question involved in this case is whether the evidence introduced on the trial would, if it had been submitted to the jury, have justified them in finding a waiver on the part of the defendants of their legal right to the possession of the timber from which the logs in dispute were cut, so as to entitle plaintiffs to the possession of said logs under the bill of sale given to them as security. And it is held that, in the light of the testimony, there could be no possible justification for such a finding, and that the trial judge properly so determined. An examination of the entire opinion and of the former decision is essential to a full understanding of the case.

Error to Wayne. (Hosmer, J.) Argued June 27, 1894. Decided September 25, 1894.

Replevin. Plaintiffs bring error. Affirmed. The facts are stated in the opinion, and in 88 Mich. 315.

*Weadock & Purcell* (*T. E. Tarsney* and *M. Brennan,* of counsel), for appellants.

*Watts S. Humphrey* (*John D. Conely,* of counsel), for defendants.

Hooker, J. On August 4, 1886, one Gamble, who is plaintiffs' assignor, purchased of one Webber certain lands, upon a land contract, for the sum of $6,500. This contract provided that no timber or logs should be cut or removed from said land, without the written consent of Webber, until full payment should have been made.

On November 24, 1886, Gamble made an agreement in writing with James G. Ross, defendants' intestate, for the sale of all the pine timber upon certain other lands contiguous to those mentioned in the contract with Webber, for $30,000. This contract provided that—

" It is distinctly agreed that the ownership and possession of said lands and premises, and all the standing and other timber thereon, shall continue and remain in the party of the first part until the execution and delivery of the deed of conveyance aforesaid, and that the party of the second part shall not cut, or suffer to be cut, any timber upon said land, unless he shall have first made application in writing therefor to the said party of the first part, specifying in said application the amount of timber and particular description of land which the party of the second part desires to cut, and until the party of the first part shall have first given a written permission to the said party of the second part to cut the quantity of timber or the description of land so specified and applied for."

On December 30, 1889, Ross being dead, the defendants (with the exception of defendant Connolly), being his heirs, made a written contract with Gamble, whereby they consented:

." *That whereas,* James G. Ross, doing business in the name of Ross & Co., and from whom the parties of the first part acquire title to certain pine timber standing and growing upon certain land hereinafter mentioned, as the heirs and successors of the same said James G. Ross, has made a contract with the said Henry Gamble, party of the second part, for the sale of said pine timber growing and being upon certain lands of the Lake Superior Ship-Canal, Railroad & Iron Co., the pine timber on said lands having been purchased by said Ross & Co., which timber is upon the following described lands [here follows description];

"*And whereas,* the said party of the second part desires to manufacture the said pine timber growing and being upon the said lands, in wany board pine timber, for the Quebec market, and also into saw-logs; and *whereas,* said second party has not paid in full for the said timber, according to the conditions of the said prior contract made with the said Ross & Co., which contract was dated the 24th day of November, 1886; and *whereas,* there was due upon the said contract of November 24, 1886, to the said parties of the first part, as heirs of the said James G. Ross, deceased, the sum of $21,394.78 on the first day of November, 1889:

"It is hereby understood and agreed that the said parties of the first part consent to the said party of the second part manufacturing the said pine into said wany board pine timber and into saw-logs, according as the same will manufacture most advantageously into said wany board pine timber or saw-logs, the said timber to be manufactured during the winter of 1890, and prior to the first of May, 1890, by the said party of the second part; it being understood and agreed that the said parties of the first part will advance to the said party of the second part, as the work of manufacturing the said timber as aforesaid shall be carried on, four (4) cents per cubic foot, string measure, for all wany board pine timber so manufactured, when said timber shall be loaded upon the cars of the Duluth, South Shore & Atlantic Railway Co., and four (4) cents in addition when said timber shall land upon the banks of Waiska river or Waiska bay or upon the shore of Lake Superior, at such point or points as shall be agreed upon between the first and second parties, in Chippewa county, Michigan; it being further understood that the first parties shall advance to said second party the

amount of the freight to be paid upon the said wany board pine timber, for shipping the same to Quebec, Canada, where the said timber is to be taken for sale.

"It is further understood and agreed that, for all saw-logs manufactured from said timber, said party of the second part shall receive advances from said first parties, when the logs are loaded upon the cars, two dollars per thousand feet, board measure, and when banked upon the said Waiska river or Waiska bay or the shores of Lake Superior, at such points agreed upon between the said parties as above stated, said party of the second part shall receive from said first parties two dollars per thousand feet, board measure, in addition, by way of advances.

"And it is further understood and agreed that the parties of the first part shall sell the said wany board pine timber in the Quebec market, and out of the proceeds of said sale shall retain seven (7) per cent. interest per annum upon the moneys so advanced to said second party, and five (5) per cent. commission upon the amount of said wany board pine timber sold, for services in and about said business, and shall deduct the same from the said proceeds, as well as the expenses of James Connolly, agent of said first parties, in looking after the said lumbering business while it shall be carried on by the said second party; and there shall also be deducted from the amount received from the sale of the said wany board pine timber, as well as from the sale of the said saw-logs above mentioned, the amount due upon the said contract of November 24, 1886, to wit, the sum of $21,394.78, due November 1, 1889, together with interest that shall accrue under the provision of the said contract of November 24, 1886, up to the time of the final sale of the said timber and logs.

"It is further understood and agreed that all of the said wany board pine timber so manufactured shall be not less than nineteen (19) inches, string measure, average, and not less than twenty-four (24) feet, lineal measure, average, and as much larger and longer as possible, and the said timber shall be at least ninety-two (92) per cent. first quality, and eight (8) per cent. second class; the timber, when manufactured, to be measured and scaled in the woods, where manufactured, by a Quebec scaler, to be agreed upon between the parties; said scaler to be paid for his services by first and second parties, share and share alike.

"It is further understood and agreed that all of the said timber and logs so manufactured upon the said property shall be and remain the property of the said parties of the first part until all of said advances, interets, and commissions above mentioned, as well as the amount due for stumpage under the provisions of the contract of November 24, 1886, shall be fully paid. Said wany board pine timber, when manufactured, is to be marked diamond ⟨R⟩ on the sides, and logs are to be marked diamond ⟨R⟩ on the ends, by the said second party.

"It is further understood and agreed that all of the horses, harnesses, sleighs, and camp equipage and utensils are to be the property of the said first parties until said timber shall be paid for, that shall be used in the camps in manufacturing the said timber and logs upon the land in question.

"It is further understood and agreed that provided the said timber is not being cut by the said party of the second part. in a workman-like manner, and in accordance with the provisions of this contract, the said parties of the first part shall have the right to take possession of the camps· carrying on the work of manufacture of the said timber, without any notice to the said second party whatever, and carry forward the said work under their own directions, and at the expense of the said party of the second part, and shall account to the said second party for any profits that may arise after carrying out this contract herein contained, and after the deduction of the expenses in so carrying out the same caused by the failure of the said second party to execute the same according to agreement.

"It is further understood and agreed that the said second party shall give to said first parties an assignment of his contract which he holds from William L. Webber, of East Saginaw, Michigan, for the purchase of lands, or interest in lands, described as follows [here follows description], as collateral security to the said first parties that he execute and carry out the contract herein contained, and pay the balance due the said parties of the first part under the said contract of November 24, 1886, above referred to, made and executed with Ross & Co. as aforesaid.

"It is further understood and agreed that the said first parties shall render an account to said second party as to all sales made of the said timber and logs.

"It is further understood and agreed that whereas it is claimed by the said party of the second part that he has had negotiations for the sale of the said wany board pine timber to certain parties in Quebec, known as J. Burstall & Co., and has personally agreed with them for the sale of the same at certain prices, which prices have been agreed upon in writing, said first parties will allow the said parties referred to to have the first right of purchase of the said timber at the prices agreed upon with the said party of the second part, providing the timber shall be paid for immediately upon delivery at Quebec, in the spring or summer of 1890, but if not paid for immediately the parties of the first part will dispose of the same to other parties.

"It is further understood and agreed that the said parties of the first part shall dispose of the said saw-logs so manufactured, and out of the proceeds of the same shall deduct first the seven per cent. interest for advances, five per cent. for commission, and expenses of James Connolly in and about the business, and the moneys due under the said contract of November 24, 1886, as above referred to, so far as the same shall not have been previously paid by the said second party, or from the sale and proceeds of said wany board pine timber above referred to, until the said interest, advances, commissions, and former indebtedness, and amount due under said contract of November 24, 1886, shall be fully paid.

"And it is further understood and agreed that the said saw-logs shall be the property of the said first parties until all of the said interest, advances, commissions, and amounts due under said contract of November 24, 1886, shall be fully paid."

On June 6, 1890, Gamble executed and delivered the following writing:

"*Whereas*, William L. Webber, of East Saginaw, Michigan, and Henry Gamble, of the same place, made and entered into one certain land contract on the 4th day of August, 1886, by which said Webber agreed to sell, and the said Gamble agreed to buy, the following described land, viz. [here follows description of premises];

"*And whereas*, the said Gamble did on the 30th day of December, A. D. 1889, enter into one certain contract with William Ross, Frank Ross, John Theo. Ross, Frances Ella Ross, and Annie Ross, successors of James G. Ross,

as parties of the first part, by which the said Gamble agreed to assign said contract for the purchase of the above-described land, upon conditions therein contained, to said first parties in said contract last aforesaid;

"*And whereas,* there yet remains unpaid upon the purchase price of said land the sum of $3,600; and *whereas,* said first parties to said contract last above named have agreed to advance the said sum of $3,600 to pay said Webber said balance:

" Now, therefore, the said Henry Gamble, for a valuable consideration to him paid, and for the purposes stated in said contract of December 30, 1889, and to secure said Rosses for the amount advanced to pay the purchase price of said land, does hereby sell, assign, transfer, and set over said contract to the Rosses above named, and hereby authorizes said Webber to make, execute, and deliver to them the warranty deed of said land specified in said contract, to said first parties in said contract of December 30, 1889, for the purposes aforesaid."

Webber deeded to the Ross heirs the same day.

Inasmuch as Gamble had no right, under his contract with Webber, to cut or remove timber from the Webber tract until it should be fully paid for, he made the arrangement of June 6, whereby they (the Ross heirs) agreed to pay the remaining $3,600 to Webber, and take a deed of the premises from Webber. Gamble's version of that arrangement is that, in accordance with the contract of December 30, he had contracted with Burstall & Co., of Quebec, to deliver to them 100,000 feet of wany pine, and, finding that he would not be able to get it from the Ross lands, he had a talk with defendant Connolly, who was agent of the other defendants, wherein it was agreed that he (Gamble) should go to work and put in the board timber on the Burstall contract, and make an assignment of the Webber contract, so that defendants could have a deed from Webber; they agreeing to pay the $3,600 to Webber, thereby releasing the lands from the restriction upon cutting.

Gamble got out a quantity of logs, and had them rafted

to the mill of the John Spry Lumber Company. On July 17, 1890, he made a bill of sale of these logs, which are the logs in controversy, to the plaintiffs, as security for an advancement of $9,382.85. The lumber from these logs came to the possession of the defendants, from whom it was replevied by the plaintiffs. The circuit judge directed a verdict for the defendants, and the plaintiffs appeal.

Counsel for the plaintiffs contend that the evidence presented two questions which should have been submitted to the jury—

"1. If the Rosses had any lien on the Webber land, did they waive it, and permit Gamble to take the Webber logs for his own benefit?

"2. Whether or not the receipts given by Osgood in pursuance of the telegram of June 23 and the order of June 24 were procured by fraud."

Upon a review of a former trial of this cause, this Court construed the contracts referred to. See 88 Mich. 315. It was there held that—

"The several contracts and the deed must, therefore, be treated as a mortgage, under which the Rosses were secured for the advances made for the purchase of the Webber land, and the faithful performance of the contract of December 30, 1889. * * * The legal title was vested in the Rosses, subject to be defeated and vest in Gamble on the performance of the conditions. * * * The mere fact that the Rosses permitted Gamble to lumber the Webber land with their land would not be a waiver of their rights under this security, under the circumstances admitted upon this record by plaintiff Gamble."

The Court said further:

"Plaintiff [i. e., Gamble] insists, however, and so testifies, that the defendants had nothing whatever to do with the lumbering of the Webber lands, made no advances upon those logs or lumber, and no agreement was ever made that they should do so. He also insists that he never knew the contents of the order given by him upon Osgood to hold the lumber subject to the order of the Rosses; that he signed the paper without knowing its con-

tents. Under the plaintiff's claim, it was a question of fact for the jury *whether defendants made advances upon the logs from the Webber lands.* It was also a question of fact whether the plaintiff knowingly signed the order to turn the lumber over to the Rosses which was manufactured from the Webber lands. * * * *If the defendants did make advances upon the lumbering of the Webber lands, and the plaintiff* [*i. e.,* Gamble] *so understood, and assented to it, and received the advances, it is very strong evidence that the defendants did not intend to release their security upon the Webber lands and the timber thereon, and that the plaintiff did not understand that the defendants intended so to do. These circumstances would show pretty clearly that the parties understood that the Webber lands were still held as security by the defendants.* If, on the other hand, the advances were not made on the Webber logs, and not so understood or intended, *it would be some evidence* that the defendants were permitting the plaintiff to handle the Webber timber as he saw fit, *and were taking their chances that he would apply the proceeds* to the payment of his indebtedness to them under the contract."

Counsel seem to argue that the former decision settles this case, *i. e.,* that it was for the jury to determine both of the questions which they claim to have been in dispute at the last trial. This is certainly true as to the question of waiver, if there is any evidence of waiver upon this record. It is not necessarily so as to the receipts and order. An explanation of these now becomes important. Osgood sawed the lumber under a written contract with Gamble, by which he agreed to deliver the lumber to Gamble, on the rail of vessels, when required. Connolly presented a receipt to Osgood, with the request that he sign it. Osgood objected and declined, but, Connolly insisting, he telegraphed to Gamble as follows:

"June 22, 1890.

"To HENRY GAMBLE,

"East Saginaw, Mich.:

"Connolly demands that I give Ross & Co. receipt for your raft, and hold lumber subject to their order. Wire me instructions. S. W. OSGOOD."

To this telegram, Gamble replied by wire as follows:

"June 23, 1890.
"To S. W. Osgood,
    "Chippewa House:
"Yes, you can give Connolly receipt for my raft.
                                    "H. Gamble."

Thereupon Osgood signed the following receipt:

"Sailors' Encampment, June 21, 1890.
"Received from John Ross & Co. raft of pine logs
marked G. and H., which are to be manufactured into
lumber as per contract with Henry Gamble, and will hold
the lumber produced of said logs subject to the order of
John Ross & Co., they guaranteeing payment of saw-bill
on same, according to the terms of the contract.
                                    "S. W. Osgood."

There were three rafts, and a similar receipt was given
for each. They were dated June 21, August 20, and Sep-
tember 20, 1890, respectively. . On June 24 Gamble signed
the following order at the request of Mr. Connolly:

"Bay City, June 24, 1890.
"S. W. Osgood, Esq.,
    "Sailors' Landing:
"*Dear Sir:* You will please hold, subject to order John
Ross & Co., all the logs I have delivered and will deliver
from Waiska Bay,—about 3,000,000 feet. I am going up
to-morrow or next day, and will give you instructions how
to cut them into lumber, which lumber you will also hold
subject to their order.
                    "Yours truly,
                                    "Henry Gamble."

As to these four writings, plaintiffs claim that Gamble
was unaware of their contents, and did not understand that
they contained anything in the nature of an acknowledg-
ment of a claim by defendants upon the lumber. Gamble
says that he did not know from Osgood's dispatch "that
it meant for them to get my logs," and that "I authorized
Mr. Osgood to receipt for the raft because I wanted to
hold him responsible for the logs after they were delivered

there." As to the order signed at Connolly's request, which he says is the only one of the papers that he saw, he testifies that he was in a hurry, and stopped to talk with him a minute; that Connolly said Osgood would not receipt, and that he ought to be responsible for the logs in case they got loose, to which Gamble replied, "Yes, he has got to receipt for the logs, because my contract with him is to receive them at the boom;" that Connolly said, "You had better give me some instructions to Osgood in regard to the sawing," and that he replied, "All right; you write it;" and that he did so, and Gamble signed it without reading it. It is therefore possible that Gamble did not know that he had given a written order to Connolly for the delivery of the lumber to the defendants  He had, however, previously sent a telegram to Osgood which fully justified him in signing a receipt in the same language as that of the order; and there can be no claim that this was obtained by fraud, or through ignorance on the part of Gamble of its character. These papers, as stated by the Court upon the former hearing, unexplained, are "cogent evidence in support of the defendants' claim that they were not waiving any rights to this timber, and that Gamble was recognizing their right." If, however, they were given under a misapprehension on the part of Gamble, it would overcome the effect of such recognition, but it is not easy to see how it could tend in any way to show that the defendants were waiving any rights. By taking such papers, whether with the full knowledge and consent of Gamble, or by craftily misleading him, they signified no intention to waive anything. In short, the evidence of a waiver must be found elsewhere. The evidence was admissible to controvert the presumption arising from the giving of such receipts and order by Gamble, but the fact that Gamble did not know he had recognized defendants' right, which certainly existed if it had not been waived, is no

evidence at all that there had been such waiver by the defendants. So it becomes an unimportant question, hinging upon the other. If the court ought to have left the question of waiver to the jury, they might consider this testimony as tending to counteract the effect of the order and receipts offered by way of denial of the waiver. If the court should not have left the question of waiver to the jury, the evidence under discussion has no materiality.

It remains to ascertain whether there was evidence in the case that would have justified the jury in finding a waiver. This waiver that is claimed amounts in substance to this: That the defendants, with the legal right to the possession of all the timber upon the Webber lands, by their conduct, waived their right to claim it from Gamble or his assignees. The amount of timber involved was large. In December these defendants were making a contract in which they carefully preserved this right, and as late as June they took a deed of the premises for the same purpose. Plaintiffs claimed that this deed was taken to secure only $3,600, but upon its face it contains evidence that the contract of December 30 was in mind at this time. It was drawn by Gamble's counsel, by his direction, in the absence of Connolly. But the question depends upon what arrangements were made for the cutting of this Webber tract, and defendants must be content, for the present purpose, to take Gamble's testimony as true. If that fairly shows a waiver, the case should have gone to the jury. In looking for the specific evidence in support of this alleged waiver, we find it pointed out in plaintiff's supplemental brief. It is there said that defendant's security upon the Webber land *was not released* by the *assignment and deed* of the Webber contract and land, "but by their express agreement, by their chosen representative, nearly two months before the assignment of the Webber contract and deed were made." We are not cited

to the place in the record where any such agreement is found, but an examination of Gamble's testimony shows that, finding that he was going to be unable to get enough wany board timber from the Ross lands to fill the Burstall contract, he proposed to Connolly to get it from the Webber tract. At this time he was in default upon that contract, and Webber had obtained a decree foreclosing it. Moreover, by the terms of the contract, he had no right to cut timber until Webber was fully paid. He says that he told Connolly he could get fifteen or eighteen thousand feet of board timber there, and that Connolly agreed to make advances upon it, the lumber to go on the Burstall contract. To do this, however, he got Connolly to agree to pay the $3,600 back to Webber as stated. He proceeded to cut timber, and a short time after he saw Connolly again, and said to him that he would like to put in the Webber timber. The timber was not yet delivered on the Burstall contract, but he could conveniently put in the Webber timber then, and at the same time some of the timber from the Ross land, near by. Witness continued as follows:

" He was willing I should put in the Webber timber, but he said that they could not advance me on the Webber timber, because they said what they wanted was to close up the land contract,—close up that deal.

" *Q.* You mean the Webber saw-logs?

"*A.* No, but the Ross land deal.

" *Q.* Let me understand. Was it what Mr. Connolly said, that they would not advance you any money to cut into saw-logs the timber on the Webber lands?

"*A.* Yes, sir; I would have to make my own arrangements; that they would not advance me any money on the Webber timber. Then I said, of course I would have to put in the Ross timber adjoining it, because if I left it there it would be in danger of fire, and he said, ' All right,' if I could put that in they would advance me on that, but they would not advance me on the Webber timber,—I would have to make my own arrangements about

that; and I told them I could do so.  That was some time, I should say, along about the middle of April; perhaps the latter—sometime along the latter—part of April."

Here, then, is the agreement that constitutes the alleged waiver; and, of this, all that is of any particular force as a waiver is the consent that Gamble might cut the timber, and the volunteered statement by Connolly that defendants could not advance any money upon it, and that he (Gamble) would have to make his own arrangements about advances, which he told them he could do.

This testimony should be read in the light of his cross-examination.  He admitted that he told Connolly that he wanted money enough on the Webber land to pay the balance, so that he might cut off the board timber to fill the Burstall contract, because the bottom had dropped out of board timber in Quebec, and he knew they could buy the board timber for 10 cents a foot less than they had agreed to pay him, and he was afraid that they would repudiate the contract.  He asked these advances of Connolly for his own benefit.  He continued as follows:

"Q. What did you agree to do in consideration of this $3,600 being advanced by Mr. Connolly?

"A. Agreed to cut off the board timber, and put it in. That was all,—about all the agreement there was about it. I agreed to give him an assignment of the property, and have the deed made out to them.  I agreed to give them an assignment of the property, and have a deed made to Ross & Co.  If they would pay up the $3,600, I would have the deed made out to them, to secure them, and put the title in Ross & Co.,—the title to this Webber land.

"Q. Did Mr. Connolly, for himself or for the Rosses, agree to do anything further for you than to put in the $3,600?

"A. No, sir; he did not.

"Q. Did they agree to release you in any way from any obligations you had made?

"A. I don't know of any.  I don't think there was any conversation about any such thing.

" *Q.* What did Mr. Connolly say that he would have to do before making that advance?

"*A.* I don't know as he said he had to do anything. He said he would write to the Rosses, and get instructions from them, and the next time I met him he said they would pay the money.

" *Q.* Was that in February or March?

"*A.* No, I think that was—that would be later than—along the latter part of February to along in March some time. I would not be positive as to the time.

" *Q.* Where were you when you had this conversation with Mr. Connolly?

"*A.* I was on the train, on the cars going down to St. Ignace,—going from the junction to St. Ignace,—and he was on the train. I could not remember the conversation. I know he said they would advance the money, and that I could have the deed made out to the Rosses. There might have been something else said."

Being interrogated about the alleged waiver, he said:

"*A.* I could not give the date of the next conversation I had with him, but it was when I had made up mind to cut off the Webber timber, and spoke to him about it.

" *Q.* What do you mean by the Webber timber? The board timber?

"*A.* The logs. I think that was along the middle or latter part of April, if I recollect right. My impression is that it was in St. Ignace. I would not be positive of that. It might be at the Sherwood House. I don't recollect. I am not clear on that point. I do not remember who was present at that time. I told Mr. Connolly that I would like to put in the Webber timber logs,—to lumber the Webber lands into logs,—and he consented that I might.

" *Q.* Just what did you say to him?

"*A.* I could not state the conversation. As I remember it now, I told Mr. Connolly that I would like to lumber the Webber logs,—timber into logs,—as it was handy to the road, and that there was a good many bills back on the timber,—winter bills on the winter job,—and I owed considerable, and I would like to put myself in shape so I could pay it. He said that it was all right; that we could lumber it, but they could not advance me on the timber; I would have to make my own arrangements about it, on the Webber lands,—on the logs.

" *Q.* They could not advance you on the Webber logs?

"*A.* Yes, sir; he said I would have to make my own arrangements. I told him I could do so; that I would do so.

" *Q.* For the purpose of putting in the Webber logs, you would make your own arrangements and get your own advances?

"*A.* I then said to him that it would be necessary to cut the Ross timber that was mixed in with it, because it would not do to leave it; and he said he would advance me on the Ross timber sufficient to put it in, but he could not advance on the Webber, because he said what they wanted was to close up the land account. They did not want to enter into any further details."

He further testified as follows:

"*A.* After the land was paid for I had—so long as the deed remained in Mr. Webber I had no right to cut it.

" *Q.* When the deed went to the Rosses you had no right to cut it, except by an arrangement with the Rosses, did you?

"*A.* I understood— It was talked over, and they consented to it.

"*Q.* They consented to it under what provisions?

"*A.* There were no provisions about it, as I have stated. I stated all the conversation there was about it. They were to advance the $3,600 to Mr. Webber, and I was to go on and take off the board timber, and put it on that to fill the Burstall contract, which they would get the proceeds of, less the amount that it cost to put it in. That is about all the conversation there was. I could not detail the conversation. That is the substance of the conversation.

" *Q.* Then he was to make the advances to you for getting out this wany board timber?

"*A.* Mr. Connolly; yes, sir."

Gamble further admitted that he did draw on Connolly for every dollar that he used in manufacturing the Webber timber into logs, except five or six hundred dollars, and that these drafts were honored. This five hundred or six hundred dollars, he says, was money that Weller (a contractor) owed him for supplies, and he turned it.

He admits that he drew on Connolly to pay for the supplies. We have seen that upon a former trial it was contended that these advancements were not made for timber cut on the Webber lands, which was held to be an important point. Again, he admits that the logs from the two parcels were mixed up, together. Meantime he was writing Connolly frequently about money, and making statements of what he was doing, what logs were out, and the disposition he had made of them. He admitted receiving the telegram as follows:

"13th August, '90.

"To HENRY GAMBLE,
    "Sault Ste. Marie, Mich.:
    "Am informed that Bearinger is making advances on logs. Answer.

"J. CONNOLLY."

To this he sent the following answer:

    "SAULT STE. MARIE, MICH., August 13, 1890.
" To J. CONNOLLY:
    "Bearinger is not making advances on logs. Why not accept draft?

"H. GAMBLE."

As late as June 6, 1890, in the assignment from Gamble, made in the absence of Connolly, by Gamble's attorney and at Gamble's direction, the following clause was inserted:

    "Now, therefore, the said Henry Gamble, for a valuable consideration to him paid, and for the purposes stated in said contract of December 30, 1889, and to secure said Rosses for the amount advanced to pay the purchase price of said land, does hereby sell, assign, transfer, and set over said contract."

It appears also from Gamble's cross-examination that he took an insurance policy upon the lumber, while at Spry's, payable to John Ross & Co. as their interest might appear, and drew on Connolly for the premium, which was paid.

In the light of all these circumstances, should Connolly's

alleged statement, "You will have to make your own arrangements about that," be construed into an agreement that Gamble might go on and lumber this land, using the timber to procure advances from other sources? In the first place, that language is as easily construed to have meant "You will have to make your own arrangements about getting money to get out the Webber timber" as about getting advances on the Webber timber. Or, if the latter construction is to be taken, it was as consistent with the meaning that he would have to arrange with the Ross heirs himself as that he was to be relieved from the burden of the restriction in his contracts,—a relief which it is very doubtful if Connolly had the power to grant him. It appears that, in one of these conversations, Connolly was promising Gamble to write for instructions, and it is quite reasonable to think that Gamble was given to understand that he would have to arrange for these advances with the heirs, in person. It is significant that Gamble did not attempt to get advances elsewhere, but actually did get them of Connolly. In the light of all this testimony, there could be no possible justification for a jury's finding the waiver claimed, and the judge properly so determined.

The judgment will be affirmed.

The other Justices concurred.